17-1101 at L. New Jersey Board of Public Utilities at L Petitioners v. Federal Integrations Commission Mr. Mabey from Petitioner Monitoring Analytics LLC Mr. Hall from Petitioner A&P Inc. Mr. Bishop, Mr. Mason from Respondent Post, Mr. Flynn from Engineer PJM Interconnection LLC Mr. Mason May it please the Court, I'm Jeff Mason, Counsel for the Independent Market Monitor for PJM. I will speak to the first issue in this case, the definition of congestion revenue and whether congestion revenue includes balancing congestion revenue. Congestion revenue is created when load pays more for power than generators are paid for power. This chart explains congestion revenue. On the left side in blue, half the load is served by a local generator that costs $10 per MWh. The other half is served by a generator on the right in yellow that costs only $5 per MWh. The cheaper generator can only serve part of load because there is a limiting transmission line connecting the cheaper generator to the load. The load pays $10 for every MWh even though half the MWh only costs $5. The equation in green shows the difference between load payments and total payments to generation as congestion revenue. The simple math here is all that matters in this case. The math was sound in 1997. It remains sound in 2016. The contested orders offer no rational potential. Let me ask you a question at the outset that follows me somewhat. If I read the briefs, particularly the government brief in this case, apparently there is a division of view amongst load-serving entities as to whether this present rule helps or hurts. Is that correct? No, that's not correct. All load-serving entities are on your side? Load-serving entities are on our side. I beg your pardon? Load-serving entities are on our side. All of them? If any business that is characterized by being a load-serving entity is on our side, I can't say that none of the financial traders don't have some small-scale operation. No, I'm not talking about financial traders. I was puzzled at what the government said, that the load-service entities actually benefited from this rule. Right, that's false. That's false and it's way to the mouth. I'm not sure I understand that because load-serving entities are the initial recipients or holders of the ARRs from which the FTRs flow. Correct. And so if the change is something that is intended to increase the value of and decrease the underfunding of FTRs, why is that not something beneficial to the load-serving entities? Well, because there's no such thing as an underfunding problem the way that the commission is describing it. And the reason is in the math. The math shows that load pays $1,000. But whether there were or not an underfunding problem, if something is bolstering the value of a financial instrument that originates in the hands of the load-serving entity, it's just not clear to me why that would be a detriment to the load-serving entity. When the market changed, originally all load got was FTRs. And so that was the only product. Load got an FTR. It entitled it to a return of congestion revenue. Then in 2003, the rules changed somewhat. And instead of getting an FTR, load was allocated an ARR. Load could do two things. Load could continue to take the ARR and convert it to an FTR, as expired in 2016, and receive a return of congestion revenue in the same manner it always had. Its second option was to turn the ARR over to the FTR market and then receive auction revenues that resulted from participants buying FTRs in that market. And then those buyers of the FTRs then received the uncertain congestion revenue. So the problem in the 2016 order is it undermines all of that. In particular, we look at first a load-serving entity that gets an ARR and then converts it to an FTR. Previously, it would get back a portion of congestion revenue that was paid. Now, in addition to getting back a portion of congestion revenue that it pays, it also has to pay a negative congestion charge, a negative balance of congestion charge. And there's no reason to pay that charge. That doesn't benefit load at all. In the FTR market... So that's your key fight, above all else, is that you don't want the load-serving entities to be liable for the real-time congestion charges. That's correct. That is it. That's the economic fight. That's the economic fight. You know, I wasn't really expecting there to be a link between the other case and this case. But just as Judge Garland said in reference to the other case, if you have a cash register, you can't pay more out at the Senate. That's the fundamental thing going on in this case. The cash register is congestion revenue. Congestion revenue, it's not a flaw in the market that congestion revenue comes about. It's from the normal operation of L&P markets. Did you deny the proposition that over the last five years or so, the amount of money in the pot to pay the FTRs has diminished? No. As a mathematical matter, the math is always right. The math always produces congestion revenue at some level. The level of congestion revenue depends on how much power is obtained from the cheaper generators that are on the other side of the constraint and how much power is obtained from the local generators on the north side of the constraint. That's what produces congestion revenue. I'm a little puzzled. How can there be a disagreement over how much money is in the pot to distribute to the FTR holders? There should be no disagreement. But there is. A lot of confusion has been spread about the nature of congestion revenue and what it is. And one of the arguments that— You can finish your sentence. I'm sorry. One of the confusing arguments is one that the Commission references, which is the idea they're a hedging product. They're not a hedging product. They're not a hedging—they've been called an offset. And so you could loosely use the word hedge to mean the same thing as offset, to mean that when load pays $1,000, it gets back the congestion revenue, in this case $250. That's an offset to what it pays, $1,000. But it's not a hedge. It's not a risk management product. But there has become some confusion about the nature of congestion revenue and ARRs to associate them with financial derivative risk management type products, and that's not what they are. And Mr. Mavis, I was under the impression that you were challenging the exclusion of the balancing congestion from the FTRs. Well, it's the exclusion of balancing congestion from the calculation of total congestion revenue. There are two stages to the markets. There's a day-ahead market and a real-time market. And in the day-ahead market, it determines day-ahead congestion revenue. Then things change. Generator availability changes. Transmission constraints changes. Load levels change. And so you have a balancing market that gets the final answer. The final answer is – in that balancing market, you have balancing congestion revenue. That revenue can be positive, negative, or it could be no change. Typically negative, no? In recent years, it's been negative. In the early years, it was positive. In either case, it's just an adjustment to the total revenue collected. Now, to the extent that an FTR includes the balancing congestion, it would seem to be kind of a hedge. I don't know what risk would be hedged against. I mean, if you mean – it is an offset. It's an offset to what load pays in terms of its $1,000 and the occasional market price. I have fixed contracts based on the day-ahead market, and I'm expecting to receive power at a certain price. And then in the real-time market, there are obstacles to my getting that, and I have to pay more. Then that's something that is an extra cost. It's unanticipated. It's not going to be covered by the contract. Now, that's not really how it works because the load always pays $1,000, and so that's not changing. Now, if load wants to get a risk management product against congestion pricing, it can go get a financial derivative, and it can do that voluntarily, and there are markets that would allow it to manage those risks. But FTRs don't provide protection against congestion pricing. If you pay a lot of money to the generator in the blue zone, that's money that the generator gets. And so there's not going to be any congestion revenue coming back to you from that payment because there is no money. The only money that can come back to you is when you pay more under a locational market price than what it costs to pay the generator in the cheaper zone. And so that money comes back as an offset. The reason it does that, the policy behind it, is not hedging. It is to duplicate in L&P markets the same service that was received in the prior regulatory regime, which was firm transmission service. Why do you care whether they label it hedging or not? Why is that relevant to the lawsuit? It's only relevant to the confusion. I was asked the question, why is it that there's a disagreement? And it's the confusion that has, I think, been distraceable to the use of this term hedging, the misuse of it. Well, anyway, I'm sort of puzzled, and I'll ask counsel for the government, why there's this disagreement as to whether or not there's a shortfall in the distribution for FTRs at the end of the process. Right, there is no shortfall. What they mean, what they will tell you, this is what FERC will look to, is something called the total, what is it, an allocation mechanism that is used to determine, because once you have load getting all the congestion revenue, you have to allocate it among various load-reserving entities. And so there is a process to allocate those rights among different load-reserving entities. So the target allocation is the term I'm looking for. That is part of the formula that is used to allocate the money to different load. And so the sum of the target allocations can be different from total congestion revenue. It could be higher, lower, or the same. But that's not underfunding. That's just a target that's used to allocate the money. You think the target is just mistaken? The target is mistaken, and the target is mistaken because there is a very difficult problem that PGM faces that we've been working on, and that is that in the dayhead market, to make the market more efficient, you want that target allocation to be close to what goes on in real time. That's a lot of hard work. I mean, that includes getting the weather prediction right, the load prediction, all of that. And so PGM is under a lot of pressure to make its markets more efficient by getting that target allocation closer to real time, but that requires real hard work. One way to avoid that work is to just take negative balance of congestion and assign it to load, and your problem magically disappears. But it doesn't, because what it ends up doing is, the net result really, is that load subsidizes speculative activity in the FGR market. Yes. Tony, I didn't quite understand that in your brief. Why? It seems to me your basic argument is between, as you see it, between the load-serving entities and the speculators in the financial market. That's right. Why is that? What is your fight with them, and why? Well, what the FGR market does, and I was mentioning before the development of our FGRs, the way all balance of congestion is allocated, and how that moved to the AR model, and with that one thing, the load could continue, as it always had, and have an FGR, or it could go to the auction. And there— That's AR gives them the option. Right, it does. And so the other side of that transaction is someone who says, I'll take the uncertain congestion revenue, and I'll make a fixed payment in this market for that product, and then that money will flow to the LSEs. Right. So fundamentally, that's an exchange of a fixed payment for a speculative payment about what will happen. The speculation isn't bad. It's necessary to make the FGR market work. The speculation isn't necessary to make any of the derivatives markets work. I'm with you so far. What's that? I'm with you so far, so go ahead. So that's why it's speculative activity. Now, in doing the allocation mechanism, there's this target allocation, which we've already understood is not about— That's sort of your assumption. The target allocation is your assumption. Is their assumption in the beginning of how much electricity will flow over what period of time, right? Right. It's an assumption, and it's pretty much known to be wrong. It's known to consistently not predict the level of capability that will actually be in the system in the real time. So that's your view. They should just change the target allocations, and then there wouldn't be a shortfall. Right. We should improve modeling. And it's a very hard effort. There's always going to be— That assumes a certain efficiency of the capability of the transmission lines themselves, doesn't it? Right. It assumes in day and day. And if you raise your target allocation too high, then you may not have the capacity to move electricity on the grid. That's correct, but the target allocation really doesn't—it's really not part of what's necessary to make the markets work. It's just part of how you allocate the rights amongst load, because it's hard to attribute congestion revenue in a particular actor in a network market model. And so that's really its only role. And while it would be—the reason why it would be better to have it more accurate is more accurate information earlier is better for markets, but you don't actually need it. And so what really needs to happen is the congestion revenue has to go back to load, and it needs—in the day ahead market, when speculators come in, what their role is to buy an FDR based on what they think total congestion revenue will be. So they are the ones that are supposed to be taking on the risk that there will be differences in the target allocation ways in the risk, whatever the day ahead results will be and whatever the real-time results will be, because that's what produces the congestion revenue. And so that's the very risk that they're supposed to be taking on. And you argue that they should retain the balancing congestion part of FDRs, and I think FERC responds that when allocation of congestion has been part of FDRs, it's just led to load-serving entities indirectly paying in terms of reduced ARR allocations, and they base the new order on trying to respond to that. Right. That's a very misleading argument. And the reason why is that in order to make target allocations closer to congestion revenue, PJM took a unilateral action, and that unilateral action was to reduce the allocation of ARRs to load. So less of the system that load paid for by paying for transmission charges is now being allocated to load. That artificially boosts the FDR price, but it means load gets less of the system it pays for. It means it gets less total ARR rates. Does this have anything to do with their decision to reduce the return for LSEs who are operating transmission lines on a legacy basis that aren't really being used? If I recall, I think that issue is one that PJM proposed as a – one of its solutions, if I've got you right, that it was one of the solutions it proposed, and that's part of the other issue that will be addressed by – Are they connected? Are these issues connected? There is some connection, but we have – there's a whole separate issue with just how the allocation works and how you – because the problem – one problem in the FDR market that fortunately is not part of this case, and it's confusing, but that is that the allocation metric uses paths, the contract paths to do the allocation, and that really isn't accurate in a network model. It's the source of a lot of mischief. It's something we're working hard to correct. But it is an allocator, and so you have to allocate it some way. That's the way it's done, and we think there are better ways, but we don't really think that that's an issue in this case. That's another problem to fix. Is it accurate, Mr. May, to say that other regional markets, FDR-like instruments, do not include balancing congestion? Well, I know the ISO in New England does it the pre-2016 way. They do it the correct way. They calculate total congestion as day-after-day congestion plus real-time congestion. I thought that the briefing said that several other regional ISOs don't, and I'm just wondering, if that's the case, how could it be not just and reasonable to calculate FDRs based only on the day-ahead congestion revenue? The reason it wouldn't be just and reasonable is because the math here. There's no reason after a load is paid for power, LMP, to impose a charge for negative balancing congestion that basically exceeds the money in the cash register. That can't be just and reasonable anywhere. They're basically double-charging. Yeah. Basically, you pay for power, and suddenly there's artificial charge. And what is that charge about? I want to go back to the other question. Why are they paying this charge? They're paying this charge because there's this FDR market where they exchange that risk of uncertain payout for a fixed payout, and the parties that have bought that uncertain payout now feel that that risk should be subsidized if this arbitrary metric target allocation isn't met. And so the very benefit of the transaction in the FDR market to make that change of uncertain payment is lost because now there's this unhedgable – I won't do this word, unhedgable – un… Right, because didn't you just say earlier that if somebody wanted to hedge against that… Well, the key is unhedgable. …buy a market. I mean, if you want to hedge… Get it by an instrument, too. If you want to hedge it, you have to go to a financial derivatives market, one that wouldn't be regulated by FERC. And so – and you can hedge – you can hedge L&P. You just go to a different market. Counsel, what are your basic legal arguments? Well, the basic legal arguments… It's fair to say that you argue that the change of the policy on this by FERC was arbitrary and capricious. Right, it's arbitrary and capricious, but also there's the… Well, that simply means unreasonable, which coincides with the reasonable statutory definition, isn't it? Yes. Well, the only question is whether they're reasonable. Well, those are additional… Whether it's reasonable. And you say they're unreasonable. Why? Because they've changed from an old system without adequate explanation? No, it's unreasonable because there's no – they have chosen to regulate by L&P markets. L&P markets operate a certain way. They produce congestion revenue. There is a policy that FERC has not changed. In fact, CITE's in their brief that says that we want to duplicate firm transmission and the L&P market as it is previously. But the only – what they don't apparently appreciate is that the only way to do that is to return balance of congestion to low and not to do anything – not to do what they've done, which is have this totally additional charge placed on top of L&P. That just makes no sense. And that's – you know, one of the reasons why we're here is that this really just goes to a core issue of how L&P markets should properly work. I have a question. And if we… I'm sorry. You can finish your answer. All right. So if we mess this up, then nothing but problems are going to build on top of it because a core mechanic of L&P will be… Why isn't this just a policy decision? It's not a – the policy decision was to have L&P markets, which was taken in 1997. I'm sorry. I can't hear you, Counselor. There was a policy decision. PERC does not have to regulate through competition. PERC does not have to approve L&P markets. But in 1997, they did on the basis of extensive expert testimony that explained all of this and how this math works. And it explained that the purpose of FDRs was to continue to provide firm transmission service to load in the new L&P design. It explained that balance of congestion is an offset to L&P payments and that congestion revenue should be returned to load. And then for 18 years, PERC – the Commission implemented that policy. And in 2012, there was a complaint, and that complaint asked that balance of congestion be charged to load, and the PERC said no. Then the complaint was filed again in 2013. PERC said no again with prejudice. Then in 2015, PERC considered all the evidence again and, on a hearing, confirmed its initial order and said that balancing is not unjust and unreasonable to return balance of congestion. But that doesn't change their mind. Why is it unreasonable? I don't understand. Because they did not change – the only thing that – the only reason that they give for changing their mind was change in circumstances. And there is no change in circumstances. There is no change in – for one thing, in 2012 and 2013 and 2015, you had the same – the thing they call revenue adequacy was there. And they explained in those orders that FDRs should be valued by the market, and they were correct. And they haven't explained anything that's changed. Nothing changed, and they were right the first time, and so there's no change. I still don't understand your answer to my very first question, which is why the load-bearing entities object to something when it affects the value of a product that is initially allocated to them. In other words, if the idea is to prop up the value of FTRs, FTRs, you can keep them. You don't have to trade them into the market. If they're going to be artificially given more value because the balancing congestion is peeled away, then that's a benefit that you're going to get, no?  Now, as a result of the contested orders, if I convert my ARR to an FTR, I get a share of congestion revenues, but then a new charge comes along and charges me negative balancing congestion. And that charge appears out of nowhere, and I'm not helped by the increase in FDR revenues. So there's an increased FTR payment that is boosted by the absence of that congestion balancing, presumably helping you offset the cost of the congestion balancing that's no longer being paid through the FTR mechanism. The boost in the increase in FDR value doesn't help, and part of it is that PGM continues to under-allocate ARRs, so it's a price quantity. Wait a minute, why doesn't the increase in the value of the FTR help you? I don't understand that. It doesn't help because there's another charge that's placed on top of L&P, and that all you would expect to get back... But wait a minute, if the, what my colleague was pointing out, if the FTR, which you could hold, increases in value because of what Burke's done... I'm sorry, one thing is that the increase in value does not occur through the entitlement to congestion revenue. There's no increase there, no change. So if I take an ARR and convert it to an FTR, I get no money back because of the change in value. There's no change in value. All I get is the allocation of the congestion revenue. That's all I get. I get nothing. The only change in value that occurs is in the FTR market, and that is those LSEs that don't just convert to the FTR. But go to the market and say, we'll get the option... You take their option advantage under the ARR. Right, but they get ARRs. Yeah. And so they're not getting FTR revenues anymore. Well, no, if you get an ARR, you have an option, don't you? No, all you get is the option revenues now. I thought I understood you had a choice. Once you had ARR, you had a choice of taking an FTR or going to the option revenue, one or the other. Right. You get one or the other. Well, then you could take the FTR. Right. If you take the FTR, there's no change in its value. Yes, I understand that. Well, except to the extent that its value or its payment is increased because the balancing congestion has been... the obligation to deal with the balancing congestion has been taken out of it. If you take the FTR, there's no change in payment. If I just convert my ARR to an FTR, there's no change. No change from what to what? There's no increase in payment because FTRs are valued more in the FTR market. I think that the FTR market is a secondary market. So an FTR is an obligation and a benefit. So you have an FTR, and if congestion revenue is positive, you're going to get a share of that, right? That's right. And then typically, as I understand from the examples in the briefing, the same-day market also has some congestion balancing, typically in recent years negative, right? And that also becomes part of what the FTR takes on board. And so they're going to get less of the positive congestion revenue because some of it they have an obligation. These are the congestion balancing, right? Right. And load isn't entitled to more than the congestion revenue it pays. So that's right. Right. Nobody is. FTR is. Because it would make no sense for load to get paid more than congestion revenue either. Right. And so on that side of the equation, it's just congestion revenue. And I don't think it's really an obligation or a benefit. It's just an offset. It's just money that's owed back to load. And they should not pay this crazy charge that has nothing to do with returning congestion revenue to load. Maybe it's the confusion in part. Is there a – so presumably this would only apply to not-yet-issued FTRs? It's not going to change – like, is there a retroactivity problem here? Is that part of what – I don't think there's – it's going – we're concerned about just a fundamental change to LMP. Right now, this rule is in effect. Right now, you know, more money is being diverted away from load that should get congestion revenue back over parties. That's, you know – Were you a moment ago suggesting that the instrument is worth less or could be worth less to you if you got it directly, the LRM? Do I have the initials correctly? The LRP? LRP? LMP. LMP. That's right. The LMP is worth – could be worth more in the auction market than it is if you direct receive it from the NJ? In the market, if you take your ARR and you say, I'll take revenues, and then – LMP or – goddammit, I can't remember. FTR. When you start talking about LMP, you're getting – the FTR – you keep the FTR itself. Right. Were you suggesting that if you just hold it, it would not increase in value in accordance with the analysis, but it could increase in value in the auction market? Is that what you point? Right. It could raise auction revenues if the FTR gets more money. But you're still at a disadvantage. What should happen is if I sell my ARR to the FTR holder, it should exchange the rights that I would have had from the FTR. But instead, unlike the buyer of the FTR, I get the auction revenues, but I also pay – You also have to pay real-time balancing. The FTR holder doesn't have to pay that. But presumably, you would get a higher price for that FTR under the new regime because the market knows that the FTR holder doesn't have to pay the balancing congestion. And so the question is, if the market's working properly, why isn't that the case? And given that you're the original holders of the ARR with the option to keep or sell the FTR and that the market should reflect the increased price of the FTR once the balancing congestion is taken out of it, why isn't it a wash for you? It's not a wash because a lot of load isn't participating in that auction, so it doesn't get that benefit. Because they're keeping the ARR? Because they convert their ARR directly to an FTR and they don't get any auction revenue. Well, that's their choice. Yeah. That's their choice, what's so puzzling to us. That's what's puzzling to us. That's their choice. If they would – if the whole point of this reform is to boost the market price of FTR and the market is doing better than the non-market holder of FTR or casher-in of FTR, then why wouldn't that make you want to move into the market? Well, one of the – the boost in the price of FTRs does flow some additional money back to those load entities that are allocated an ARR. As a result of these rules, they've been allocated less. Is that your basic objection, that the allocation of ARRs has changed to disadvantage certain legacy transmission lines? No, that's really a side objection. The real objection is the mechanics of L&P and that boosting the values, artificially boosting the value of FTRs doesn't make sense. It's much better to let the market do the valuation of FTRs because that's what the market's there for. This is an artificial intervention, part of it restricting supply, part of it by taking part of congestion revenue, the part that's negative, and taking it out of the calculation and allocating more congestion revenue than actually exists. And that all comes at the expense of load. And load is worse off when that happens, even if there is some increase in the auction revenues in the auction. Further questions? Okay. I just have one other question, and that's about these allocation issues. The September 15th order mentions that the reforms that PJM proposed to address revenue adequacy had raised allocation issues. And so that's one of your – you're saying that's a side issue? Right. One of the changed circumstances that the Commission looked at was PJM's unilateral decision and a misguided decision to begin restricting ARRs that it allocated, which harms load because they get less of the system that they're entitled to. And instead, it does have this boosting effect that we discussed. But that was a mistake, and it was unilateral. And FERC – well, PJM, when it made its filing, it said the markets have become unjust and unreasonable because we did this. And we agree with PJM. The action, the unilateral action that PJM took was – did have an unjust and unreasonable result. And so we think the reasonable response of FERC to that might have been to order PJM not to do that, that policy that PJM admitted was unjust and unreasonable. That would have been rational. Instead, they looked entirely away from the issues that this pleading concerned, which were all about how to fix the allocation problem and not to change the fundamental mechanic of L&P that determines balance of congestion revenue, and instead ordered that this equation be changed and said that we're going to add this new charge for negative balance of congestion on top of what load pays for L&P. One thing that's a little unclear to me is that the order says that FTR values are based solely on congestion revenues in the day-ahead market, but that FTRs are funded based on revenues from both the day-ahead and real-time markets. And what's not clear to me is why isn't it fixed for that to let the market set FTR values to account for both markets rather than to take out of FTR funding the balancing from the same-day market, real-time market. Well, to the extent the order said that, it wasn't describing the actual way it works. They weren't describing L&P and congestion revenue, which is part of this two-stage market design. There was a decision in 2003 that made some description like that that I saw quoted in the briefs, but that was describing the model that we think is the right model, so it was a mistaken description. And the fact that they chose this arbitrary allocator to be the day-ahead-based target allocation just doesn't change the fact that we're only talking about an allocation mechanism, and we're not talking about a mechanism that should determine the size of congestion revenue, which is the only money that should fund FTR payoffs. Are there further questions? Okay, thank you. For Hall, you have seven minutes. May it please the Court, my name is Garrett Hall. I represent American Municipal Power, Inc., and I am going to address the next two issues, thankfully the only two remaining issues. These issues relate to what PJM had actually proposed in its initial filing that underlies the two decisions that are at issue in this case. In contrast, what Mr. Mace was addressing was the remedy that the Commission had adopted and in the process or at the same time rejected the two proposals that PJM had put forth and that I'm going to discuss. So the first of these is the portfolio netting issue, and the portfolio netting issue has to do with positive FTRs and negative FTRs. Positive FTRs correlate to an actual flow of energy on the transmission system and over a congested path. And in contrast, the negative FTRs are essentially a speculative interest instrument that is held typically by financial participants in the market. It has a purpose. It does facilitate some more FTR allocations. Is that clear what the negative FTR here does? So the negative FTR, I guess it's best to compare it to the positive FTR. In the case of the positive FTR... We know the positive FTR. Okay. So the holder is receiving in that case a payment when there's activity on that path. And so in the case of the negative FTR, that holder of that negative FTR is paying into the pool of funds that are used to fund the FTRs. That's the only thing I understand about it, because in a locational marginal price market, the way that I understand from the papers in this case, there is congestion revenue. It's a positive. So I don't see where there's a negative FTR. The whole point of the FTR as an instrument is because generators offer power into a market at varying prices, and the market clearing price is going to be higher than the price at which certain generators are willing to deliver power, then there's going to be this revenue where that's the difference between the price of some offers and the market clearing price. Am I correct? Am I correct in the negative is a situation where the price at the sink is lower than it is at the source? Is that the point? That's a true statement, but I don't think that was Judge Pollard's point. Hers, I think, is more fundamental, and that is she wants to know what is the origin of this animal. So by way of elaborating, everything that you said, Judge Pollard, is correct. That is how the FTR comes to be. But layered on top of that allocation of FTRs and that market for FTR, that volume of FTRs, is an additional volume of positive FTRs that are facilitated by the auctioning off of negative FTRs. So this is basically incremental to what the real capability of the transmission system is, and it's essentially an artificial FTR in a sense. It has negative value in relation to the positive FTR that it corresponds to. And it's not a creature of congestion balancing? I didn't hear your question. I said it's not a creature of congestion balancing? I guess in my view, I don't think that it's directly related to congestion balancing in the sense that the positive FTRs are allocated up to a level that reflects the actual capability of the transmission system. It's something beyond that. But it does exist, and so probably debating its origin is maybe the best use of the next couple minutes. But what I would like to explain a little bit is the nature of the problem with the netting of these two instruments against one another. And the problem revolves around which parties hold them and the effect of the netting on the different parties and how the parties are holding those FTRs. If the parties happen to be holding positive FTRs in a portfolio that includes negative FTRs and they're allowed to net against them, they can avoid some of the payment obligations that would normally be corresponding with the negative FTRs. Or in the reverse scenario, they can be avoiding the effect of an underfunding, a so-called underfunding of FTRs by essentially getting more value for the positive FTRs that they have in their portfolio. And this situation is usually associated with the financial marketplace. A load-serving entity generally doesn't hold what the Commission in its orders has described as a speculative, meaning with a positive value, speculative negative FTR. So the load-serving entities, the entities that have an obligation to serve customers, and therefore the customers are the ones who are disadvantaged by this treatment. So if you were to eliminate under the order the netting, you would make what? You would make speculation much less desirable. Is that correct? Not necessarily. There was some argument in that vein. And really sort of you're, I think, getting to the crux of the legal issue here, which is whether FERC properly explained or fully explained, reasonably explained the decision that it made. And arguing that it did not, FERC recognized the problem. There's basically no factual dispute here in terms of what the problem is, I don't think. I'm not sure I understand what the problem is. I don't understand why netting is not sort of an obvious way of handling the market. Well, there's some form of netting no matter what, and that happens at the end of the day. It's really a question of the timing of the netting. Is the netting done within the portfolio, or is it simply a function of the settlement process? And so if these two instruments had exactly the same value, the timing wouldn't matter. Here they do have different value because of this payout ratio. And so if you have a portfolio and you have one instrument that has an obligation to pay, and another that has a right to receive revenue, the right to receive revenue is prorated based on the level of funding that's available. The obligation to pay shouldn't be because there's no payment, so why should it be getting the benefit? Oh, I see. You want the negative characters to pay through the nose. They're not supposed to get any benefit from purchasing positive FTRs. Not exactly, Your Honor. Pretty close. The problem that we see is the sort of— You really want to eliminate the value of negative. Well, the value, taking the first view, is that the value will be properly set in the auction, presumably either way. And that's one of our problems with the explanation for the decision, is that for recognizing the issue, if you don't want to call it a problem, the scenario where the load-serving entities are receiving, for their positive FTRs, an amount that's less than the portfolio holder does. So the result of your position would be the elimination of negative FTRs. We're not taking that position. No, but economically, would that happen? Would that happen? Yeah. Is that your desirable objective? No, it isn't a desirable objective of my clients, and I don't think that that would necessarily happen. It's possible that those negative FTRs would receive less value in the auction process, but I don't think that they would go. Oh, I see. Further questions? I'm sorry. We'll hear now from the person. Good morning. Anand Viswanathan on behalf of the Commission. So if I could just briefly touch on a couple of the concepts that came up with respect to this netting rule, and then I'll turn back to the many questions on the issue of balance and congestion. So, Pillard, you asked the question about the point of the negative financial transition rights, also known as counterflow rights. The point of these rights, I think it's a little confusing to refer to them as positive and negative. I mean, the way to think about that is that they're opposite payment streams. If you recall, you probably don't recall this from our brief, but the way in which PJM limits the number of the rights that are available is based on the physical capability of the various transition rights. So if you can imagine a very simple example where you have a line that's from point A to point B that supports 100 megawatts of financial transition rights, that is the maximum number of rights that that line can hold. The only way to get more, so for example, if there is demand of, let's say, 125 megawatts, the only way to support that additional 25 megawatts of demand for positive or prevailing flow of financial transition rights is if someone else comes in and says, I will buy the counterflow or negative value right for that 25 megawatts. The net there is zero because, remember, the way positive value rights work is... Now tell me why somebody would buy the negative if the likelihood of transmission is only 100. Well, because I think that if you're acquiring the negative right, if you think about it in terms of the option, you are receiving the option price and you are paying the expected value of congestion. So if you're a party interested in buying counterflow or negative value rights, what that means is you're making a calculation or a bet that you think that what you're going to receive in terms of the option price is going to benefit you more than what you have to pay. So remember, if you're acquiring a positive financial transition right, you are paying the option price, and then in return, PJAMS is going to pay you the value of congestion in today's market. Well, I had that question earlier, whether the negative FTR was essentially a situation where the price at the sink was less than the price at the source. Is that what happens? That's exactly right. And so the only way that PJAMS is going to... And part of the reason they have this physical limit is we are not going to pay positive value rights more than the congestion that we expect to receive. But so if there are, in my example, the 25 megawatts of additional positive rights, in that scenario, there's no additional funding that PJAMS has to come up with in terms of congestion. So whatever PJAMS owes to that additional 25 megawatts of positive rights is being covered and paid by the negative right holders who are paying the 25 megawatts of negative or counterflow. That's the point of it. But I think maybe Judge Sotomayor is content with the answer to his question, but why would anybody buy that? And why is it even something that FERC can regulate if it doesn't correspond to any actual physical value? Well, I think the point that... I mean, first of all, it's not as if there are certain market participants who acquire certain kinds of rights and others that only acquire... So it's not as if financial speculators are the only ones that acquire counterflow rights. We know from our record that load-serving entities do, in fact, acquire counterflow rights. They do it to sort of create different sort of hedges within their portfolios. As I mentioned before, the counterflow rights don't affect the funding levels. This is something that I think all parties in this proceeding have agreed at some point before the commission that negative value counterflow rights are actually beneficial to the market because, as I mentioned before, they enable additional demand for positive value prevailing flow rights to be supported. It allows for a more robust trading marketplace. Each negative FCR allows the creation of a positive. Exactly. The only way you can get negative rights is if the capability on that particular financial transmission right pathway is full. So that's why I used the example of the 100-megawatt pathway because it allows you more than that. I'll turn quickly to the issue of... There's been quite a bit of...quite a few questions on this issue of what the benefit or harm is to load-serving entities from the real-time costs that have been referred to as balancing congestion. What do you do with this basic argument that the entire premise of Kirk's opinion is wrong? There is no diminution in the value of the FCRs at the end of the process. There's plenty of money to pay them off. Well, I think that's based on some sort of theoretical idea that there's no such thing as underfunding. I mean, we know for a fact that that's not true. That's not how the market operator has ever viewed this marketplace. They come up with a report on a regular basis that shows how much revenue has been collected from congestion-related price differences in the day-ahead market. We know for a fact that... I thought I understood him to say it had to do with the target allocation. Yeah, and the way that PJM defines target allocation is by reference day-ahead energy market price. That's really the question. And this is in your opinion. FCR values are determined solely based on congestion price differences in the day-ahead market. Why? I mean, if we have these two kinds of congestion that have to be dealt with, and what we're looking for is some kind of instrument to smooth the bumps for load, it would seem to be that the real-time market is at least as important to include in those instruments. And it just seems artificial that FCR values would be determined based on only the day-ahead market. Well, I think part of the problem there is that the way these products have been defined from the outset, which is not before the score, this is a product that's existed in PJM for almost 20 years. And it has included congestion balancing. Well, we are, in fact, in the course of a redefinition of this product now. Well, I mean, I think what PJM tried to argue here is that there is a difference, an inconsistency between how the products are valued or priced versus how they are settled or paid out. And what that means is that the way the product is valued or priced is based on the market's expectation before the auction. By whom? The market was supposed to price them. The market is pricing them with respect to the auction. That is, that the market is making an expectation of what the congestion-related price differences will be in the day-ahead market. As a result of the issue of real-time cost or balancing congestion, it's not just the way these rights are paid out is not just based on day-ahead energy market price differences, which is what this product was created. We have commissioned precedent on that. PJM has said that on the record. But the point of this product was to offer a hedge against congestion-related prices in the day-ahead market. But as a result of the consistent underfunding, the underfunding being the real-time, the largest contributor of underfunding, I think, in our record, is that those real-time costs are the biggest source of that. What's your best site for that, that the largest source of underfunding in the market? So, there's a number of sites on the record. So, I can give you the commission order site first, and then you can go to the record as well. In the orders, JA-472, paragraph 96, as well as JA-887, paragraph 75. And what the commission was relying upon there is there's a report by – there's an analysis that PJM did, and one of its files is in this record. So, you say there in paragraph 96 that the inclusion of balancing congestion in the FTR settlement process has been a leading cause of FTR revenue inadequacy. Do you have any data or studies to support that? Absolutely. So, if you turn to – there's a couple different places. There is JA-839 to 840. And this is a filing by PJM. And what it essentially – there's a chart. Yeah, so the chart is on page JA-840. What it's depicting there is levels of funding for financial transmission rights when those real-time costs are taken out of the funding for financial transmission rights versus when they're kept in. So, the top graph there shows that we're mostly at 100% when those real-time costs are not taken out of funding for financial transmission rights. I'll just point out that there hasn't really been a dispute in the record that those real-time costs, balancing congestion, is a large source of underfunding financial transmission rights. I think they dispute the concept of whether underfunding exists in the first place. Right, and I'm sort of mystified by that because my understanding of how a market is supposed to work is that you wouldn't keep period after period expecting to get funded at a level that corresponds to only one element of the risk that your instrument is actually representing. Right. And I just don't understand that. Right. Why these would be valued consistently based on the day-ahead market when, in fact, they end up being paid based on the day-ahead of the real-time market. I just – I don't understand that. Sure, and I think that that is the central problem that PJM is trying to deal with because as a result of those real-time costs being taken out of the value – No, no, no, no, no. What my colleague is asking is a question that puzzles me too. Why the devil doesn't the auction price reflect in the past the fact that the real-time was balanced at the end? I mean, that's – you've got to – if you're buying the FDR in the market, you have to think about, well, gee, what happens if a tree falls? And we can calculate the risk of that, and therefore, that should be reflected in the price. So I think both of us are puzzled as to why doesn't the price at the auction reflect the risk of daily balancing or real-time balancing? Well, so I want to be clear about that. It absolutely does affect the price. Am I asking the same question you are, Councillor? Yes. So it absolutely does. The value at auction is affected by those real-time costs in the sense that the market has an expectation of underfunding, and that's depressing the price at the auction. And I think this gets – But that's assuming the conclusion. Why does the market assume underfunding? Why can't – why doesn't the market assume if we pay the price, it'll be adequate funding? I don't get it. What's wrong with the market? That's what I don't get. Well, I think that the market is assuming underfunding because the last few years have shown that there is underfunding in this. So the underfunding is a representation of the risk of what's happening in the real-time market. That's exactly right. And I think that this – So it's a proxy for that. So that is the way in which the market is doing exactly what Judge Silverman is asking. Yes, that's exactly right. And I think that this goes to the question of – Why wouldn't the market fund them, which is so puzzling to me? Well, this is a consequence of the way that the rules existed in PGM for how these products were settled. And I think that's the problem that PGM is trying to get at. Maybe the intervener can answer that question. I'll sort of – Well, I think that – let me try to get to the question that's not – that is related to this about benefit or harm to the load-serving entities from this issue of the real-time costs. Right. And I think I started mentioning this before. The central problem here that PGM was trying to address was funding levels for financial transmission rates. As a result of these real-time costs, as a result of this underfunding of financial transmission rates, there's really three ways in which load-serving entities are harmed. They're harmed because they get less congestion revenue. They're harmed because they get less auction revenue. And they're harmed because there are fewer auction revenue rates available. Let me briefly explain that. As you mentioned before, I think, Joe Silverman, you're correct that load-serving entities absolutely have a choice between whether they keep the auction revenue that comes from auction revenue rates or whether they convert it to get congestion revenue from financial transmission rates, and that happens all the time. We know for a fact that load-serving entities absolutely do that. They absolutely take advantage of holding financial transmission rates. The approach that PGM had taken prior to the Orders on Review to address the funding issue and was motivated because there was not a stakeholder consensus on a broader set of reforms was, among other things, to cut the allocation of certain types of auction rates. What that meant, as we explained in our brief, is that fewer, as they're called, Stage 1B auction rates are available. So if you're a load-serving entity that would normally get Stage 1B rates, there's a pretty good chance you're not getting that revenue. So, as I mentioned, those are the three ways in which load-serving entities are harmed by the funding issues in PGM. Let me get at this a different way. Is there a function of the market, the FTR market, whether one includes balancing congestion or is now excluding balancing congestion, that is supposed to trigger investment in transmission or transmission reliability, and is part of the desire to separate the two separate kinds of congestion related to that? I'm not sure how much the financial transmission rate market is intended to spur investments in reliability. I think the way that that sort of gets looped into this is the issue of the highest priority auction rates, which are called Stage 1A auction rates, because, as you may recall from the record in the briefs, those are the only auction rates that must be allocated. And so if there's not enough – if system conditions don't support all the requests of Stage 1A rates, then PGM has to sort of rerun their model of how the transmission system functions to make sure they can accommodate them. Or there are fewer Stage 1A ARs, right? I mean, that's the whole thing about updating the basis for calculating those rates. So are you referring to the proposal, the 1.5 percent demand proposal? No, the alternative that they adopted about updating this. Yeah, so I think that the concern – and I think a lot of this is motivated by the sort of cost shifts that have happened between various auction rate holders, because the Stage 1A folks are going to get their auction rates no matter what. PGM needs to, under its rules, rerun its system to accommodate all those. That can crowd out the other folks, the Stage 1B and Stage 2 auction rate holders. And so part of what was motivating PGM here was to preserve the value of those products as a hedge against congestion, because by addressing the largest source of underfunding of those rates, it strengthens the market for that product. It has an effect on auction revenues. And I think we've mentioned this in our briefs, and the Commission of Orders has mentioned this as well, that load-serving entities in particular benefit from a more robust market for financial transition rates and auction revenues. Why is it that no load-serving entities are on your side? I don't think that's true. I believe that there's at least one load-serving entity that's part of the interveners group, TSE&G. Oh, I see. So I don't think it's fair to say that all load-serving entities necessarily agree with the petitioners on this. And I'm going to emphasize that I think the Commission here was trying to make sure that this product was working the way it was designed, and that's to provide priority to load-serving entities. I don't think anyone disputes the idea that load-serving entities should be the beneficiary of congestion revenue to hedge against congestion-related costs. But the way that PJM designed that market to work in the first place was that the way they get congestion revenue is through those products. And so these orders are intended to preserve the value of those products as they were intended. One final question. Sure. What is your response to their basic argument that there is no underfunding? That's an illusion. I don't think there's support for that at all. I mean, I think that the Commission accepted PJM's explanation here that there is such a thing as underfunding, and the way PJM has always defined the funding issue is by reference to day-ahead energy market prices. And so if the target allocation is proper, there's no underfunding. Isn't that what I heard them argue this morning? So I think that – I mean, the way I understood it from their briefs was that there's – I didn't understand it from the briefs. I understood it from this morning. So the way it seems to be expressed in the briefs was this idea that financial transmission rights holders are not entitled to full funding of those rights. And by full funding, I mean the target allocation being the difference in day-ahead energy market prices due to congestion times however many rights they hold. But the problem with that is that even if the tariff doesn't require 100% funding of those rights, that's a goal that PJM has set out to accomplish. What it was trying to do here was make sure that the product was working as intended and excluding the largest source of underfunding. I just – I think this idea of underfunding being a logical impossibility, the numbers are always right. It's just – I mean, that's not how the market operator has defined this product and how it works. So it seems like they've defined the product in two conflicting ways. They've defined the product as valued based on the day-ahead market and as funded based on the two markets together. And I mean, petitioners say that making load bear the cost of balancing congestion is just against the whole premise of the day-ahead market. If you're load and you could provide for customers, you want to lock in a price 24 hours in advance. And if you have to pay then over and above that for the cost of real-time balancing, then you've basically made the day-ahead price rise after the fact. Why is that a way to run a market when the whole original purpose, I thought, of these FDRs was to protect the predictability for load? So, first of all, you are right that there is this inconsistency between the valuation versus the funding or settlement. I think that's the problem BGM was trying to address in the first place. And I think one of the questions is whose problem is that? Right. So, the problem here is that you have to look at not just who is paying those real-time costs but what the purpose of moving those costs out of the financial transmission rate equation is. And I think what BGM was trying to do here was make sure that there is as much funding as possible for financial transmission rates. The reason for pulling out those costs, I mean, I've already mentioned that they were the largest source of underfunding for financial transmission rates. The commission pointed out that there is no – you couldn't trace back because there's many causes of those real-time costs. It can't be traced back to any particular market segment or cause. It's basically any time conditions in the day-ahead market are different from the real-time market, and that can happen from a variety of circumstances. Excuse me for interrupting. Is this really the key of the whole thing? That you at FERC and PNG – yes, I think both – have decided that this cost, this daily, this real-time cost, which is not attributable to anybody, is under your normal rules stuck with the transmission owners. I think that's exactly right, and I think you're getting to the issue of cost causation, which is where I was going. The records show that there's not any specific cause or market segment that causes these costs. There's not any specific segment of the market that's the sole beneficiary. The record reflects that these costs have system-wide benefits. That's not something anyone has disputed. So under longstanding commission policy, the commission applied those costs broadly to all customers on a pro-rata basis. That's something this court has affirmed the commission doing in the past. It's odd to say they have system-wide benefits. This is what I had the question about. Are these markets intended to signal or trigger any kind of ameliorative investment? I mean, one would think that that's the whole point of having a market, and that where real-time costs are high, that there would be an opportunity for somebody to bring those down and benefit from bringing those down, but that's not what any of these reforms are going for. I think the problem is that the real-time costs – really sort of the undercurrent that differentiates the bad costs that can be reflected in the market versus the real-time costs is that one set of costs is predictable and the other set of costs is not predictable. One set of costs is not a problem. It's a revenue that the system skims off of ratepayers, and then everybody is popular because everybody wants a piece of it. I mean, that's not a problem. The problem is in a real-time market where there are actual in-the-world impediments to the delivery of power at the negotiated price, and everyone is tearing their hair out, and no one wants to take responsibility. And so you've taken the gravy train and said, well, let's just have the FDRs deal with that. And the real difficulty – we'll just assign that to load. At the end of the day, we assign everything to load, and I just don't see the logic. There's sort of apples and oranges of trying to make the FDR market more attractive, but just because something else that PGM did to try to do that made a mess. I mean, that doesn't seem like the kind of change of circumstances that an agency usually relies on. Well, I think that – They made a mess to me in a different way. They'll keep making a mess, so let's let them do this so that they stop making those other messes. Well, so I think that the mess has existed for quite some time, and I think that, as I mentioned before, it is PGM's goal to try to fund these rights as best as it can. And so I think from – I mean, I'll let PGM's counsel speak for PGM, but from what I could take from the record, PGM didn't view it as an option to throw up its hand and say, well, there's nothing we can do about these real-time costs. I think that what they decided was that, as you put it, nobody wants – nobody can take responsibility for those real-time costs. The way that typically plays out in other commission contexts is if you can't assign a cause or beneficiary, you can spread it to the market broadly. And by ensuring that the product itself – and by the way, I don't think – well, the way that the commission has typically defined this product and its orders is that it is by reference to day-ahead market prices. So if you keep the settlement of the product consistent with the way it's valued in the day-ahead energy market, that's going to strengthen the product because there's greater funding levels, and that's going to help the entire market in terms of more congestion revenue, greater option prices, and that will only benefit everyone who participates in this market first and foremost. All right. You're long over. Let's hear what PGM says on this. Thank you. Paul Flynn for PGM. Let's start with balancing congestion. You can raise that higher. Thank you. Let's start with balancing congestion. This is essentially a cost allocation issue. You have a set of costs in the real-time market. There is a mismatch between compensation and the real-time market, which is what FERC found in paragraph 79 of the rehearing order. That is actually not necessarily related to generational load. They said this is – what we've called balancing congestion is not necessarily congestion at all. And FERC said that in paragraph 79 of the rehearing order, and in the initial order I refer you to paragraphs 83 through 85, where they summarize the PGM position that lays that out. Okay? So this was a cost allocation question, and the issue is was it reasonable for FERC to take these real-time market costs and say it's not appropriate to put those entirely on FTR holders, and instead we're going to spread them more broadly. And NASA said what? Spread them more broadly, which is what you do when you – Why isn't the FCR market a very broad spreading? In fact, if the market would be broader than allocating this load. The FCR holders is not congruent with all load. Okay? In recognition of their payment for the transmission system, and they simply keep them. And so what they get as a result of being allocated those rights is when we auction off all the financial transmission rights that the system can tolerate, in this market that you've been referring to – What percentage of the instruments are held by the load service entities instead of put up for auction? It is the vast majority. I don't have a specific percentage for you, but the vast majority of load service entities do choose to hold – because the reason they have that, the reason you created that, is to provide them a more steady revenue stream. Because again, what they're getting is instead of the daily gyrations of congestion as it changes from hour to hour, what they're getting is someone else is assessing, oh, here's what I think those gyrations will be, and I am willing to pay this amount of money for a financial transmission right in the auction. And that steady stream of money goes to the load service entities. We created it so that they could have that certainty, and they like that certainty, and they take advantage of it, mostly. But you were absolutely right in your earlier comments that load service entities always have the right to simply take the auction revenue right, which is megawatts between sources, and turn it into a financial transmission right, and go ahead and ride the congestion as it changes through the day. So FERC, in allocating this imbalance in compensation in the real-time market, as we read it, they advanced three reasonable grounds for doing that. Number one, this gets to your point about day ahead and basing this on the day ahead. It has long been the case that financial transmission rights in PJM, since they were first created, were based on real-time market prices. Why is that? Real-time market prices reflect everything that a seller can think of that may affect activity the following day. Okay? So by definition, what happens in real-time is something they couldn't expect. Now, people could be sophisticated and maybe could say, well, tack on a standard deviation or two, just to account for that. Is it fair to say that essentially the contested issue in this case is whether the real-time congestion costs should be taken out of the market, the overall market, and put to the load-serving entities? Now, that could have an economic impact in several different ways to load-serving entities, but that's essentially what's happening. Yes, on the balancing congestion issue, the question is a cost allocation question of should we take these dollars that we refer to as balancing congestion in the real-time market, which is compensation time for short, and instead of the current rule of saying all the FTR holders pay that, instead spread it over a much larger denominator of all load, because, again, what gives rise to this? It is the actions that PJM has to take in real-time to keep the system operating, and that's also where there, frankly, is a mismatching compensation in the real-time market. And pinning all of that, Burke was saying that pinning all of that on the FTR rights holders seems excessive. They're not the sole beneficiary of the language that you use. Basic question. You said the broader, spreading it more broadly across load. So load all have AR, and therefore the rights to FTR. And some more actors in the market, in the FTR market, also have FTR. So it seems that if you want to spread the cost broadly, you would spread them for the FTR market, because that's all of load and then the investors, right? If you're talking about spreading. Except what you're doing is indirect, okay, because it wouldn't be right now. It's only going to the FTR holders. Now, to answer your earlier question, it comes back indirectly to harm the FTR revenue rights holders because, as you are surmising. The price is lower. The price is lower. Yes, and I'm going to put in what Burke referred to as an imprecise risk premium into my FTR auctioning bid. Okay. And Burke found that to be economically inefficient. That's at paragraph 79 and paragraph 80. And so, yes, you could redesign the entire system and say, let's have a system in which we want people to assess that unknowable risk. We've put everything we know in the day ahead, and now we've got, by definition, the unknowns in the real time. Let's force those unknowns. Let's keep those unknowns in the bids for the financial transmission rights. And Burke said, no, that's not economically efficient. It's distorting what's happening, what that financial transmission right was always intended for and to be good at, which was a hedge against day ahead congestion. We've defined what we are trying to do. Our tariff says the goal. You certainly have increased the values of the FTR, or you, Burke has, by the price of sticking the load service entities, and this is what my colleague was concerned about, for an extra charge for real time balancing. Is that fair? It is spread broadly to load service entities. Well, I don't know why it's spread broadly. I have the same problem my colleague does. I don't understand why hitting all the LSEs with a charge for real time balancing spreads it more broadly than it would be if it was a charge, part of the cost for the FTRs in the broad market. I don't understand why hitting the LSEs. I can understand a different argument, which is the LSEs, after all, on the transmission system, and this is a cost we can't allocate to anybody, so under our normal law rules, we stick the customers with the cost. I can understand that point. I don't understand it more broadly. I have a question that I think might help clarify this. If I keep an ARR, then I get the congestion revenue from the data head market that corresponds to that? No. No. You're a load service entity. We allocate you auction revenue rates based on your historic usage of the system and on your load, okay, and you get the auction revenue rates, okay? I get auction revenue, so when people bid on FTRs, I'm going to get a chunk of that. You're going to get the steady stream of dollars that people bid into the FTR market instead of the variation in congestion. Now, they are anticipating congestion when they put in those offers, but they're taking the risk on the gradations in it. I'm sorry, go ahead. I'm just going to say, so ARR holders and FTR holders, be the FTR holders, load serving entities, or others, all those groups, whatever the auction is encompassing, whether it's encompassing only congestion revenue or also balancing congestion, they all are allocated that in an equivalent way. Indirectly for the auction revenue rates. Right, because the auction revenue is affected. Because the auction revenue is affected by what the nature of the revenue that's included in an FTR is. It's affected by what they bid into the auction, and so they will use that, what Firk referred to as the imprecise risk premium, to try and factor in the unknowables into that offer. Right. And Firk found that was inappropriate, that it was distorted. Now, we've done this on Day Ahead for a long time. We've done what on Day Ahead? We have based the value of financial transmission rates on Day Ahead since we established financial transmission rates. And as I said, part of that is because we are used to having most of our settlements in the Day Ahead market, and those are the things people can't anticipate by definition. And so that is reflected in a number of tariff provisions that have been in our tariff for quite some time. The idea that the goal is to return through FTRs the congestion that is under expected conditions. That's the language we use in Section 7.5. And so that, again, is expected conditions. Now, no one proposed to change those rules. You can scour the Firk initial review order for them responding to an argument like you heard here today of, oh, there's no such thing as underfunding. Oh, you shouldn't set your target allocation on Day Ahead rates. And the target is set specifically on Day Ahead. This idea of the target, which defines underfunding, is specifically in the tariff set on Day Ahead. Firk never responded to an argument that said you shouldn't do that because no one made it. All right, is there another question from the bench? Do you have a question? Thank you very much. All right, thank you. All right, I know there's no time left, Mr. Major. Almost 30 minutes over. I'll give you one minute to respond. Thank you, Your Honor. And the main thing I think I would like to respond to is the only remaining question I think that was in this case, at least from the perspective of the questions that I received. And that is, you mentioned the gravy train in the FDR market. And I think it's worth pointing out, we're talking about the decision to keep the FDR or whether to go to the FDR market and get the auction revenues. So one thing that should be understood is that the FDR markets have always been consistently profitable. This means that the money that Lowe would get out of the FDR market in the form of the auction revenues is less than the money that the FDR holders are getting. And so when you talk about underfunding under any understanding, you're not talking about a situation where the FDR holder paid less for the FDR and then doesn't get a larger payout from the market. They consistently get a larger payout of congestion revenue. The only question is they don't get as much payout as they would like because the balancing congestion revenue is included. And so from the perspective, and I don't want to get into the mind of the host. That's good because you're now over a minute. Are there any further questions? Thank you. Mr. Hall, you deserve a half a minute since you had half of the time available originally. So let's see what you can do in a half a minute. All right. In half a minute, Your Honor, only one thing to respond to, and that was the question regarding the underallocation of ARRs and the driver behind that. And that really gets to the legal issue with the ARR allocation question. PJM identified itself in its filing that the predominant problem driving down the ARR allocations in Stage 1B was their own choice to model very conservatively certain transmission averages. And so our argument is that by not addressing that sort of root cause and acknowledging there was a problem and finding some alternative solution to it that didn't really address what was happening before the Commission committed ARR. Okay. Are there any further questions? No. Thank you very much. We'll take the matter under submission. We'll take a brief break before the next case.
judges: Garland, Pillard, Silberman